AO 106 (Rev. 04/10) Application for a Search Warrant

ORIGINAL

SEALED

BY ORDER OF THE COURT

# UNITED STATES DISTRICT COURT
for the
District of Hawaii

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUL 11 2017

at _1_ o'clock and 30 min, P M
SUE BEITIA, CLERK

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>One Residential Condominium Located at 94-542<br>Kupuohi Street,  Unit #204, Waipahu, Hawaii | )<br>)<br>)<br>)<br>)<br>)      Case No.  17-00775 KJM |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

One Residential Condominium Located at 94-542 Kupuohi Street, #204, Waipahu, Hawaii

located in the _____ District of _____Hawaii_____ , there is now concealed *(identify the person or describe the property to be seized)*:

Documents, records, computer files and other materials as further described in Attachment "A" which is incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 2339B(a)(1) | Attempt to Knowingly Provide Material Support to a Foreign Terrorist Organization |

The application is based on these facts:

See Attached Affidavit of FBI Task Force Officer Stephen B. Biggs

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI Task Force Officer Stephen B. Biggs
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  _____07/11/2017_____

_____
*Judge's signature*

City and state:  Honolulu, Hawaii                    Kenneth J. Mansfield, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF HAWAII

IN THE MATTER OF THE SEARCH OF:
One Residential Condominium Located at 94-
542 Kupuohi Street,  Unit #204,
Waipahu, Hawaii

Mag. No.  17-00775 KJM

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Stephen B. Biggs, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.          I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 94-542 Kupuohi

Street, #204, Waipahu, Hawaii 96797, hereinafter "PREMISES," further described in

Attachment A, and for the things described in Attachment B.  Based on the facts set forth in this

affidavit, there is probable cause to believe that the PREMISES contain evidence of violations of

18 U.S.C. § 2339B (attempting to provide material support or resources to a designated foreign

terrorist organization).

2.          I am a Special Agent of the Naval Criminal Investigative Service ("NCIS") and

have been since January 2008.  I am currently assigned to the NCIS Hawaii Field Office located

in Honolulu, Hawaii.  Since 2014, I have been assigned as a Task Force Officer to the Federal

Bureau of Investigation, Honolulu Division, Joint Terrorism Task Force.  My responsibilities as

an FBI Task Force Officer include but are not limited to the investigation of domestic and

international terrorism matters with a nexus to the U.S. Department of Defense.  As an FBI Task

Force Officer, I have utilized court-authorized search warrants, conducted physical surveillance, utilized confidential informants and interviewed subjects and witnesses during domestic and international terrorism investigations.  As an FBI Task Force Officer, I have interviewed witnesses, executed court-authorized search warrants, and used other investigative techniques to determine the methods used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities. As an FBI Task Force Officer, I have received advanced training on the conduct of international terrorism investigations, maritime counterterrorism operations and investigations, and counterterrorism online investigations.  I was previously assigned to the NCIS Southeast Field Office as a member of the South Florida High Intensity Drug Trafficking Area Task Force.  Because of my training and experience as an NCIS Special Agent, I am familiar with United States Criminal Code and the Uniform Code of Military Justice.  In past investigations, I have used court-authorized search warrants for the installation of tracking devices on vehicles to assist physical surveillance, determine patterns of life, and observe criminal activity.  In past criminal investigations, I have executed search warrants that resulted in valuable physical and digital evidence collection, seized assets, and numerous subjects agreeing to cooperate with the government.  I have completed basic and advanced law enforcement training courses at the Federal Law Enforcement Training Center at Brunswick, GA and at the Federal Bureau of Investigation Training Academy at Quantico, VA.

3.         My experience as an NCIS Special Agent and FBI Task Force Officer includes, but is not limited to, counterterrorism matters, investigations of drug trafficking organizations,

the sale of illegal firearms, and the distribution of firearms by prohibited persons. I am experienced in physical surveillance, interviews of witnesses, the use of search warrants, and the use of confidential informants.

4.         The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.         This application is for a search of KANG's residence in Waipahu, Hawaii: 94-542 Kupuohi Street, #204, Waipahu, Hawaii 96797. FBI verified KANG resided at this residence over the course of the investigation through CHS reporting and records checks on KANG's vehicle. Furthermore, in a post-arrest statement, KANG granted consent to search his residence, which he identified as 94-542 Kupuohi Street, #204, Waipahu, Hawaii 96797.

## PROBABLE CAUSE

6.         On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

7.         On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State

of Iraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS" - which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIS, and ISIL. To date, ISIS remains a designated FTO.

8.         U.S. Army Staff Sergeant IKAIKA ERIK KANG ("KANG") is trained as an air traffic controller. KANG is assigned to the 25th Infantry Division, Combat Aviation Brigade, at Schofield Barracks, on Oahu. KANG lives off-base in an apartment in Waipahu, HI.

9.         At or around the beginning of September 2016, a Confidential Human Source ("CHS 1"), a person who knew KANG well, told investigating FBI agents that KANG discussed radical Islam with him. CHS 1 told agents he heard KANG talk about religion, anti-government topics, and expressing support for ISIS. On one occasion, when CHS 1 and KANG were in the car together, KANG played an audio recording of an Arabic speaker through the car stereo using his cellular telephone. When CHS 1 asked KANG what he was listening to, KANG said that he was listening to a prophet reciting the Quran. KANG further stated that the speaker had been killed in the early 2000's, but KANG could not remember if he had been killed by a bomb or became a suicide bomber.

10.        On or about March 1, 2017, KANG told CHS 1 that he had been conducting research on YouTube about the most effective and painful ways people had been tortured.

KANG added that he was still angry at a civilian who had taken away his air traffic controller's license, and that he wanted to torture him. KANG said that if he ever saw him again, he would tie him down and pour Draino in his eyes.

11.        In March 2017, CHS 1 and KANG were discussing the shooting at Pulse Nightclub in Orlando, Florida. KANG told CHS 1 that the shooter did what he had to do and later said that America is the only terrorist organization in the world. Later in March 2017, KANG told CHS 1 that Hitler was right, saying he believed in the mass killing of Jews.

12.        CHS reporting to investigating FBI agents revealed that KANG spent most of his time on his computer and online, watching violent ISIS videos or researching radical Islam. Records checks confirmed that KANG has at least two known email addresses, ikaika.kang@yahoo.com and st8of808souljah@yahoo.com; however, it is highly likely that KANG has other unknown email addresses, online profiles, and/or applications he utilizes for communication about illegal activity on his computer or in his home. To protect their criminal behavior from being traced back to a particular user, subjects will frequently switch between different methods of communication. In addition, individuals engaged in criminal activity that is unknown to their friends or family members will utilize multiple methods of communication with co-conspirators to avoid detection. From my training and experience, I know that most households contain electronic storage media, standard household computers, laptop computers, tablets and smart phones that store records of telephonic and digital communication. In my training and experience, and common knowledge, most individuals keep and maintain such

5

devices at their personal residence.  In addition to communication records, these devices

frequently provide information and evidence, including geo-location information, records of

contacts, Internet search records, photographic evidence, personal notes, and calendar

information.

13.        On or about October 17, 2016, KANG traveled to Ft. Rucker, Alabama for a six-

week military training course for senior enlisted leaders, the Air Traffic Control Operator Senior

Leadership Course.

14.        On or about November 3, 2016, the FBI conducted a court-authorized search of

KANG's lodging at Ft. Rucker.  The FBI conducted a full data extraction from KANG's external

1TB Seagate USB hard drive, and a partial data extraction from KANG's Dell Inspiron laptop,

which contained a 500GB hard drive.

15.        The FBI later conducted a forensic review of the extracted data.  The external

Seagate hard drive contained, among other things, 18 military documents marked "SECRET."

16.        A subsequent classification review by military subject matter experts confirmed

that 16 of those 18 documents remain classified today.  The metadata of these files shows that

they were first created on June 18, 2013, and were burned onto a CD (discussed below) on June

21, 2013.

17.        Subsequent FBI forensic review of the external Seagate hard drive showed that it

contained approximately 486 documents that referenced ISIS, ISIS, or violence.  These

documents included 13 issues of Inspire Magazine.  One issue was entitled "Assassination

Operations," and another entitled "Targeting."[1]  The external Seagate hard drive also contained

approximately 1221 video files that referenced ISIS, ISIS, or violence.

18.         Subsequent FBI forensic review of KANG's Inspiron laptop hard drive showed

that it contained, among other things, approximately 146 videos and 671 graphics files that

referenced ISIS, ISIS, violence, or war.

19.         On December 13, 2016, the U.S. District Court for the District of Hawaii issued

an order authorizing a search of KANG's residence in Waipahu, Hawaii.   Execution of the

search of KANG's residence occurred on December 14, 2016 and yielded the seizure of

electronic information from KANG's computer and an external storage device.  Additionally, the

FBI found a CD marked in handwriting with the words "SECRET" and "SIPR."[2]

20.         The CD in KANG's residence contained, among other things, 18 military

documents marked "SECRET."  A subsequent review by military subject matter experts

confirmed that 16 of those 18 documents remain classified today.

21.         The metadata of the foregoing files shows that the documents were copied to

KANG's Seagate external hard drive on April 18, 2015, when KANG was stationed in Hawaii.

---

[1] Inspire Magazine is an online, English-language magazine published by Al-Qa'ida in the
Arabian Peninsula (AQAP).  The publication glorifies acts of terrorism and is aimed at inciting
violence among would-be terrorists in Western, English-speaking countries.  Based on my
training and experience, Inspire Magazine is often read by individuals in the United States who
are self-radicalizing.

[2] "SIPR" is a reference to the U.S. military's Secret-level classified computer network.

The hash values show that they are the same files as the 18 classified documents found on the CD labeled "SECRET," discussed above.

22.        On or about June 20-23, 2017, FBI Undercover Employees (UCEs) traveled to Honolulu and met with KANG.

23.        On or about June 21, 2017, three FBI UCEs met with KANG at a hotel room in Honolulu and brought a micro-SD card. KANG brought his external hard drive. UCE 1 told KANG that he had saved documents from his prior service in the military onto a micro SD card, and that he to planned travel overseas and provide the micro-SD card with those military documents to ISIS. KANG offered to provide materials of his own.

24.        On or about June 21, 2017, KANG provided unclassified military documents to the UCEs for the purpose of ultimately providing them to ISIS. KANG plugged the hard drive into a computer provided by the UCEs, and KANG transferred numerous documents from the hard drive to the micro-SD card. The documents included unclassified "for official use only" ("FOUO") military documents, as well as unclassified military documents that had been approved for dissemination, such as military manuals on various topics. KANG verbally described the documents that he was providing to the UCEs, and detailed how they would be helpful to ISIS. For example, KANG described a Soldier's Manual for Common Tasks, which he said provides "checklists" for how to "react to contact, you know hasty fighting positions." KANG said that "knowing how to react to contact and communicate will help them [ie: ISIS members] a lot."

8

25.         KANG indicated that he knew the materials were not publicly accessible.  UCE 1 asked KANG if he could find "this stuff" on the Internet.  KANG responded that "everything has to be CAC'd now," referring to a military Common Access Card, which is an identity card used to log into military computer systems, and that he got it from a private military drive.

26.         On or about June 22, 2017, UCE 1 told KANG that he could not open some of the files, and KANG offered to bring his external hard drive back the following day.  UCE 1 told KANG that he wanted to look at them, and get to the bottom of asking "how can this help the Islamic state?"  KANG responded that, when he got home, he would sort out the videos for tomorrow so that he can give it to them on Saturday morning.

27.         On or about June 22, 2017, KANG also described how he could benefit ISIS by conducting combatives training.  KANG told UCE 1 that ISIS fighters were "extremely effective" at martial arts, but that they don't have any "jazz" with their technique.  UCE 1 asked KANG what he could do differently.  KANG responded that from watching their videos (referring to ISIS propaganda videos), there wasn't much grappling, and that they weren't showing any ju-jitsu arm bars or anything like that.  KANG described what he saw in the videos as just stand-up kickboxing, without specialized techniques that he described to UCE 1.

28.         On or about June 23, 2017, KANG provided 14 classified military documents to UCE 1 for the purpose of ultimately providing them to ISIS.  KANG once again met with the three UCEs in the same hotel room in Honolulu.  Kang ran searches on his hard drive using

military search terms suggested by the UCEs.[3]   The searches revealed classified military documents which KANG provided to the UCEs.

29.        KANG attempted to provide ISIS with classified military documents by copying the documents from his external Seagate hard drive onto the micro-SD card provided to him by the UCEs, which he believed the UCEs would, in turn, later pass on to ISIS.  When the UCE 2 asked if these documents would help ISIS, KANG said, "It will, definitely."  KANG also identified a document that pertained directly to the U.S. Army mission in Afghanistan.

30.        FBI forensic analysis of the 14 classified military documents on the micro-SD card confirmed that they were 14 of the 18 classified military documents that KANG retained at his residence on the CD marked "SECRET," and later transferred to his external Seagate hard drive.  The hash values show that they are the same files. The metadata of the foregoing files shows that the documents were first created on June 18, 2013.  Eighteen (18) documents were burned to the CD labeled "SECRET" on June 21, 2013.  The same 18 documents were copied and pasted from the CD to KANG's Seagate external hard drive on April 18, 2015.  KANG then copied 14 of the 18 documents onto the micro-SD card provided to him by the UCEs on June 23, 2017.  All 14 of those documents remain classified.  Of the four files that were not copied, two remain classified, and two are no longer classified.

_____

[3] Based on a prior court-authorized search, the UCEs were aware that the hard drive contained classified information.

31.        On or about June 23, 2017, UCE 3 asked KANG what was the most important

thing that KANG had given, in terms of being able to give to ISIS.  KANG responded that it was

the combatives portion. The UCEs discussed the possibility of introducing an actual member of

ISIS to KANG, and KANG expressed interest in the idea.  UCE 2 told KANG that they would be

coming back to Hawaii in two weeks, and invited KANG to stay with them.  KANG responded

"Hell yeah."  KANG said that he could make a combatives video with the ISIS member, and that

KANG would remove any affiliation, so that way it would not be incriminating.

32.        On or about July 6, 2017, UCE 1, UCE 2, and UCE 3 returned to Hawaii.  KANG

met them at a house in Honolulu.  They introduced KANG to a person who they identified as a

member of ISIS, CHS 2.  The UCEs also advised KANG that he would meet somebody the

following day, and that "He's the real deal."

33.        On or about July 7, 2017, KANG arrived at the residence.  KANG brought his

AR-15 type rifle, his pistol, a folding knife, masks, camouflage pants, vests, and a case of water.

KANG's vest had holsters that held his pistol and knife.  KANG was introduced to UCE 4, who

was described to KANG as, and who he believed to be, an ISIS leader.  KANG played several

hours of ISIS videos, and eventually moved to more graphic videos, to include a video that

KANG described as his favorite, which depicted beheadings.

34.        UCE 4 told KANG that he wanted to know who KANG was, and whether he was

with the U.S. Army, or with the Islamic State.  KANG responded that he was with the Islamic

State.  UCE 4 asked KANG whether, if he only had one bullet, and was faced with an American

11

soldier who he did not know, and CHS 2 (who KANG believed was a member of ISIS), which of them he would shoot.  KANG replied that he would shoot the soldier (referring to the U.S. soldier.)

35.        On or about July 8, 2017, KANG, UCE 4, and CHS 2 discussed the purchase of a drone at a retail store.  KANG knew that CHS 2 planned to take the drone back to the Islamic State.  KANG discussed how to fit the drone into a suitcase.

36.        KANG, UCE 4, and CHS 2 drove in CHS 2's car to the retail store.  KANG purchased a Go-Pro Karma drone with a Go-Pro camera for $1,151.82.  KANG also purchased extra batteries, propellers, and a 64gb micro-SD card for a total of $227.45.  KANG paid for the items with his debit card.  KANG accepted $700 in cash from UCE 6 (splitting approximately half of the cost).

37.        Upon returning to the residence, KANG gave an example of how the drone could allow ISIS fighters to escape a battle involving U.S. tanks.  KANG advised that U.S. tank crews are highly trained and difficult to defeat.  Therefore, a drone would allow ISIS to view the battlefield from above to find tank positions and avenues for escape.

38.        Also, on July 8, 2017, KANG swore a pledge of loyalty, commonly known as *bayat*, to Abu Bakr al-Baghdadi, the leader of ISIS.  UCE 4 read the pledge in English.  KANG accepted the pledge.  UCE 4 then gave KANG a gift—a folded ISIS flag—and read an Arabic version of the pledge, which KANG repeated verbatim in Arabic.  The pledge ended with a hug and a kiss from UCE 4.

39.          On July 8, 2017, KANG was arrested by the FBI without a warrant, based on probable cause that he had committed the crimes described herein, having just sworn *bayat* to ISIS and expressed a desire to kill "a bunch of people."

40.          Following his arrest, KANG orally waived his *Miranda* rights and signed a written *Miranda* waiver.  During the subsequent interview of him by investigating agents KANG admitted that he knowingly transferred classified information to ISIS.

41.          On July 9, 2017, KANG orally waived his rights to prompt presentment, and signed a written waiver of those rights, known as a *Corley* waiver.  KANG orally waived his *Miranda* rights and signed another written *Miranda* waiver.  During the subsequent interview of him by agents KANG was shown a video recording of the loyalty oath to ISIS that he had sworn the previous day.  Following the video KANG made the following admissions:

42.          KANG admitted that he had pledged loyalty to the leader of ISIS, Abu Bakr al-Baghdadi.  KANG said that he was not forced to pledge loyalty to the leader of ISIS.  KANG admitted that he did so voluntarily.

43.          KANG said that he took the CD labeled "SECRET" from his desk drawer at Hickam in 2015 (referring to Joint Base Pearl Harbor-Hickam, where KANG was stationed in 2015).  KANG admitted that he knew the CD was SECRET.  KANG admitted that he had kept the CD at his residence.  KANG admitted that he copied the CD with the classified documents onto his external hard drive.

44.        KANG admitted that the documents he transferred to the UCEs were classified.

45.        KANG initially said that he did not intend for the files he transferred to UCEs to go to ISIS.  He initially said that he intended them to go to the NGO.  Later in the interview, KANG admitted that when he was transferring the classified documents to the UCEs, he knew the documents would eventually be provided to the ISIS.

46.        KANG said that he knew that UCE 4 and CHS 2 were affiliated with ISIS when he was first introduced to them at the house.  KANG agreed that UCE 4 and CHS 2 did not say they were affiliated with the NGO.

47.        KANG admitted training CHS 2 in weapon tactics, grappling techniques, and ground fighting.  KANG confirmed that CHS 2 did not force KANG to do the training.

48.        KANG admitted that the training videos would provide CHS 2 with the best skill set so that CHS 2 could take it back to the Middle East to train ISIS members.

49.        KANG stated that CHS 2 was going to take the drone to the Middle East for use by ISIS.

50.        KANG said that he believed CHS 2 was going to train ISIS members with the combatives video.

51.        KANG admitted that he became interested in ISIS in 2015 when he began researching religion.  KANG said that he wanted to help the Islamic State as early as late 2015, because he saw how ill-equipped they were for the fight.  KANG confessed that he wanted to provide the Islamic State with weapons training as early as late 2015.

52.        In my training and experience, individuals involved in the above-mentioned crimes typically keep physical handwritten or printed diaries, journals, notebooks, composition books, scrap paper, or printouts that document and reflect that person's affiliation or familiarization with foreign terrorist organizations, such as ISIS.

53.        In residential searches executed in connection with criminal investigations in which I have been involved, the following kinds of personal property that tend to identify the person(s) in residence, occupancy, control of ownership of the subject premises have typically been recovered: keys, rental agreements and records, property acquisition records, utility and telephone bills and receipts, photographs, telephone answering pads, storage records, vehicle or vessel records, canceled mail envelopes, correspondence, opened or unopened, financial documents such as tax returns, bank records, safety deposit box records, cancelled checks, and other records of incomes and expenditures, credit card and bank records.

54.        The foregoing facts establish probable cause to believe that: (1) evidence, fruits, or contraband can be found at the PREMISES, including but not limited to weapons, equipment used for training and fighting hand-to-hand combat, and the records described in Attachment B; (2) such evidence, fruits, or contraband is stored on each computer or storage medium that will be searched / seized, and (3) that the computers themselves are contraband or instrumentalities.

### TECHNICAL TERMS
### COMPUTERS, CELLULAR TELEPHONES, ELECTRONIC STORAGE,
### AND FORENSIC ANALYSIS

55.        As described above and in Attachment B, this application seeks permission to

search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive, a cellular telephone, or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

56.      *Probable cause.*  I submit that if a computer, cellular telephone, or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer, cellular telephone, or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training and experience, I know that subjects who conspire, attempt, or threaten to commit violent acts and murder keep web-enabled computer devices and cellular telephones on their persons, in their vehicles, in their offices, or in their residence, or other readily accessible places. As stated above, KANG has shared ISIS propaganda videos with CHSs  and UCEs, using KANG's computer.

    b.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file

16

on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

d. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

e. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

57.     *Forensic evidence.* As further described in Attachment B, this application seeks

17

permission to locate not only computer files that might serve as direct evidence of the crimes

described on the warrant, but also for forensic electronic evidence that establishes how

computers and cellular telephones were used, the purpose of their use, who used them, and when.

There is probable cause to believe that this forensic electronic evidence will be on any storage

medium in the PREMISES because:

    a.  Data on the storage medium can provide evidence of a file that was once on the

       storage medium but has since been deleted or edited, or of a deleted portion of a file

       (such as a paragraph that has been deleted from a word processing file). Virtual

       memory paging systems can leave traces of information on the storage medium that

       show what tasks and processes were recently active.  Web browsers, e-mail programs,

       and chat programs store configuration information on the storage medium that can

       reveal information such as online nicknames and passwords.  Operating systems can

       record additional information, such as the attachment of peripherals, the attachment

       of USB flash storage devices or other external storage media, and the times the

       computer was in use. Computer file systems can record information about the dates

       files were created and the sequence in which they were created, although this

       information can later be falsified.

    b.  As explained herein, information stored within a computer, cellular telephones, and

       other electronic storage media may provide crucial evidence of the "who, what, why,

       when, where, and how" of the criminal conduct under investigation, thus enabling the

United States to establish and prove each element or alternatively, to exclude the

innocent from further suspicion.  In my training and experience, information stored

within a computer, cellular telephone, or storage media (e.g., registry information,

communications, images and movies, transactional information, records of session

times and durations, Internet history, and anti-virus, spyware, and malware detection

programs) can indicate who has used or controlled the computer or storage media.

This "user attribution" evidence is analogous to the search for "indicia of occupancy"

while executing a search warrant at a residence.  The existence or absence of anti-

virus, spyware, and malware detection programs may indicate whether the computer

was remotely accessed, thus inculpating or exculpating the computer owner.  Further,

computer and storage media activity can indicate how and when the computer or

storage media was accessed or used.  For example, as described herein, computers

typically contain information that log: computer user account session times and

durations, computer activity associated with user accounts, electronic storage media

that connected with the computer, and the IP addresses through which the computer

accessed networks and the internet.  Such information allows investigators to

understand the chronological context of computer or electronic storage media access,

use, and events relating to the crime under investigation.  Additionally, some

information stored within a computer or electronic storage media may provide crucial

evidence relating to the physical location of other evidence and the suspect.  For

19

example, images stored on a computer may both show a particular location and have

geolocation information incorporated into its file data.  Such file data typically also

contains information indicating when the file or image was created.  The existence of

such image files, along with external device connection logs, may also indicate the

presence of additional electronic storage media (e.g., a digital camera or cellular

phone with an incorporated camera).  The geographic and timeline information

described herein may either inculpate or exculpate the computer user.  Last,

information stored within a computer may provide relevant insight into the computer

user's state of mind as it relates to the offense under investigation.  For example,

information within the computer may indicate the owner's motive and intent to

commit a crime (e.g., internet searches indicating criminal planning), or

consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the

computer or password protecting/encrypting such evidence in an effort to conceal it

from law enforcement).

c.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone)

is a handheld wireless device used for voice and data communication through radio

signals.  These telephones send signals through networks of transmitter/receivers,

enabling communication with other wireless telephones or traditional "land line"

telephones.  A wireless telephone usually contains a "call log," which records the

telephone number, date, and time of calls made to and from the phone.  In addition to

enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

d.  A person with appropriate familiarity with how a computer or cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how computers and cellular telephones were used, the purpose of their use, who used them, and when.

e.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

21

information necessary to understand other evidence also falls within the scope of the warrant.

f.   Further, in finding evidence of how a computer or cellular telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

58.      *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

g.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires

22

considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

h.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

i.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

23

59.      *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

60.      I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

## REQUEST FOR SEALING AND DELAYED NOTIFICATION

61.      It is respectfully requested that this Court issue an order sealing all papers submitted in support of this application, including the application and search warrant, until further order of the Court.  Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, *i.e.*, post them publicly online through the carding forums.  Disclosure of the contents of this affidavit and related documents, or notification at this time, may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Stephen B. Biggs
Special Agent
Naval Criminal Investigative Service
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me
on July 11, 2017.

UNITED STATES MAGISTRATE JUDGE

25

## ATTACHMENT A

*Property to be searched*

The property to be searched is 94-542 Kupuohi Street, #204, Waipahu, Hawaii 96797, further described as an apartment in a multi-family dwelling.  Unit #204 is located inside the Kulana Knolls, gated community in Royal Kunia.  Kulana Knolls consists of numerous stand-alone buildings containing multiple units, inside an access-controlled gate.  A peach-colored, two-story building stands to the immediate right after passing through the key-coded, gated entry off of Kupuohi Street.  Unit #204 is contained in the blue colored two-story building facing the parking lot, past the peach two-story building.  A footpath to the right of the building connects it to the parking area.  The stairs leading to the second story landing are in the middle of the building on the right side.  The unit is a second floor, corner, end unit, with no back neighbors. The unit is approximately 759 sq. ft. and includes two bedrooms and two bathrooms.  The front door opens off of the second story landing into an open living area. The living area includes a sliding glass door leading to an approximately 66 sq. ft. lanai, overlooking green space behind the building.  The kitchen is off of the living area opposite the sliding glass door and balcony.

## ATTACHMENT B

*Property to be searched or seized*

1.       All records relating to violations of 18 U.S.C. § 2339B (Providing, or attempting, or conspiring to provide Material Support to a Foreign Terrorist Organization);  involving IKAIKA ERIK KANG, including:

      a.   Physical handwritten or printed diaries, journals, notebooks, composition books, scrap paper, and printouts;

      b.   Textbooks, books, pamphlets, and printed or published information regarding radical Islam or terrorist organizations;

      c.   Handwritten notes containing information regarding passwords, online identities, email addresses, Facebook addresses, Twitter accounts, Instagram accounts or any other information regarding alias online identities;

      d.   Any records regarding past or future travel by Ikaika Erik Kang, including schedules of past or future travel, airline or ground transportation tickets, bills, or receipts;

      e.   Waybills, air bills, bills of lading, receipts, delivery notices, and other shipping documentation from the U.S. Postal Service, small package carriers, or common carriers which indicate the shipment of packages and parcels to and from the

Mainland U.S. and Hawaii, or to or from the United States and any foreign country;

f.  Records and information relating to KANG's e-mail accounts;

g.  Records and information that KANG has saved on his computer or cellular phone regarding ISIS tactics and techniques, any information provided to KANG by ISIS, or records of communication between KANG and ISIS;

h.  Records and information relating to KANG's search history and downloads;

i.  Any documents, electronic or physical, relating to classified, sensitive, or "for official use only" information.

2.      Any and all documents, magazines, newspapers, web pages, writings, postings, photographs, videos, or other materials, in electronic or digital format, related to ISIS, terrorist organizations, firearms, weapons of mass destruction, and the reporting about (or advocacy of) any acts of violence, as well as any such materials that show KANG's state of mind as it relates to the crime under investigation.

3.      Weapons, firearms, ammunition, and any related paperwork (including licenses, permits, receipts, shipment-related documents, addresses, phone numbers, or any other identifying information), and lock-boxes, safes, or other containers used to store firearms or ammunition;

4.      Components used to create an improvised explosive device or improvised weapon, and any grenades or explosive materials;

2

5.      Documents and articles of personal property showing (or containing data showing) the identity of persons occupying, possessing, residing in, owing, frequenting, or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisitions records, utility and telephone bills and receipts, photographs, telephone answering pads, storage records, vehicle or vessel records, canceled mail envelopes, correspondence, opened or unopened, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of incomes and expenditures, credit card, and bank records;

6.      Computers, cellular telephones, or storage media used as a means to commit the violations described above, including any threats against federal officials made via computer-based communications;

7.      Computer, cellular telephone, or storage medium whose seizure is otherwise authorized by this warrant, and any computer, cellular telephone, or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER AND ELECTRONIC DEVICES"):

      a.  evidence of who used, owned, or controlled the COMPUTER AND ELECTRONIC DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

3

b. evidence of software that would allow others to control the COMPUTER AND ELECTRONIC DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the COMPUTER AND ELECTRONIC DEVICES were accessed or used to determine the chronological context of COMPUTER AND ELECTRONIC DEVICES access, use, and events relating to crime under investigation and to the COMPUTER AND ELECTRONIC DEVICES user;

e. evidence indicating the COMPUTER AND ELECTRONIC DEVICES user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER AND ELECTRONIC DEVICES of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER AND ELECTRONIC DEVICES;

h. evidence of the times the COMPUTER AND ELECTRONIC DEVICES were used;

4

    i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER AND ELECTRONIC DEVICES;

    j.  documentation and manuals that may be necessary to access the COMPUTER AND ELECTRONIC DEVICES or to conduct a forensic examination of the COMPUTER AND ELECTRONIC DEVICES;

    k.  records of or information about Internet Protocol addresses used by the COMPUTER AND ELECTRONIC DEVICES;

    l.  records of or information about the COMPUTER AND ELECTRONIC DEVICES' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

    m.  Contextual information necessary to understand the evidence described in this attachment;

8.    Routers, modems, and network equipment used to connect COMPUTER AND ELECTRONIC DEVICES to the Internet;

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "COMPUTER AND ELECTRONIC DEVICES" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.